IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CERTAIN UNDERWRITERS ) | |
| OF LLOYD'S OF LONDON, ) | |
| ) | |
| Plaintiffs, ) | |
| vs. ) | Case No. CV-99-TMP-964-S |
| ) | |
| GOGGANS INSURANCE AGENCY, ) | |
| ) | |
| Defendant. ) | |

**ENTERED**
APR 23

MEMORANDUM OPINION

Because federal courts are required constantly to monitor their subject-matter jurisdiction, this court requested on November 19, 2001, that the parties again brief the issue whether the court has subject-matter jurisdiction in this case by virtue of diversity of citizenship. Briefing was completed in early 2002, and the court has now concluded, as it perhaps foreshadowed in footnote 3 of the Order denying summary judgment, that it does not have subject-matter jurisdiction because none of the plaintiffs (much less each one of the named plaintiffs) has a claim that meets the $75,000 jurisdictional minimum amount in controversy for diversity jurisdiction.[1] See 28 U.S.C. § 1332.

At the outset, the court reiterates its previous holding that, in the context of this case and pleading set forth in the complaint, the citizenship of only the so-called "lead

---

[1] The court has reached this conclusion despite several remarks in defendant's brief that were not helpful to the process. For example, defendant perceived what he believed to be the "Court's apparent desire to find jurisdiction in this matter," (Defendant's Brief of December 21, 2001, at page 11), and asserted that plaintiffs' arguments regarding jurisdiction were "inexplicably encouraged by the Court." (Id. at 28). Counsel then asked, "Why will the Court not dismiss this case?" (Id. at 29). These remarks were not helpful and were, perhaps, inappropriate.

underwriters" needs to be considered, not that of the "Names," or members of the syndicates led by the lead underwriters. Many cases in federal court have struggled with the problem of categorizing Lloyd's syndicates as corporations, or trusts, or unincorporated associations in order to determine the proper rules to apply for assessing the citizenship of the "syndicate." Courts have concluded, most of the time, that because Lloyd's syndicates are not recognizable legal entities, they must be treated as unincorporated associations, which are deemed to be citizens of every jurisdiction in which any of their members is a citizen. See, e.g., E.R. Squibb & Sons v. Accident & Casualty Insurance Co., 160 F.3d 925 (2nd Cir. 1998); Indiana Gas Co. v. Home Insurance Co., 141 F. 3d 314 (7th Cir. 1998); Humm v. Lombard World Trade, Inc., 916 F. Supp. 291 (S.D.N.Y. 1996); Bath Iron Works Corp. v. Certain Member Companies of the Institute of London Markets, 807 F.Supp. 3 (D. Me. 1994); Lowsley-Williams v. North River Insurance Co., 884 F. Supp. 166 (D.N.J. 1995). All of these cases proceed from the fundamental assumption that the "certain underwriters" appearing as plaintiffs in the case do so, at least in part, in a representative capacity for the other "Names" in the syndicate led by the named underwriter. As the court noted in its earlier Orders, Squibb at least recognizes that this may not always be the case; it may be possible that the named plaintiff, even though a lead underwriter in a Lloyd's syndicate, is suing only in his own personal capacity, not in a representative capacity. The Second Circuit explained:

> We hold that when a Lloyd's lead underwriter is sued in a representative capacity (but not in a class action) each and every Name whom the lead

> underwriter represents must be completely diverse. But we also hold that when a Lloyd's Name (including a lead underwriter) is properly sued only in an individual capacity, it is that Name's characteristics, both as to citizenship and jurisdictional amount, that are determinative for jurisdictional purposes. And the fact that other Lloyd's underwriters who are not diverse parties in the suit may be bound by the result of the suit (whether by contract or by preclusion) is of no consequence.

Id. at 939-940. This is simply the common-sense recognition that parties often appear in different capacities and that the court must carefully analyze whether the suit is litigated in an individual capacity or a representative capacity.

The best measure of whether the suit is brought individually or in a representative capacity is the complaint itself. Unfortunately, the complaint erroneously identifies "Certain Underwriters" as a foreign corporation, although they later quickly corrected that mistake, offering the affidavit of Robert Williams, who described them as twenty separate individuals, all citizens of the United Kingdom. Two conclusions can be reached, either "Certain Underwriters" indeed filed suit as representatives of their respective syndicates, in which case the citizenship of all "Names" in the syndicates must be considered, or they filed suit only for themselves personally, in which event, under Squibb, only their citizenship need be considered. If the complaint is read as asserting a representative capacity, complete diversity is lacking because it is conceded that at least four "Names" in these syndicates are residents of Alabama. But nothing in the complaint suggests that the plaintiffs brought suit as representatives of others. The complaint does not describe the representative nature of

their capacity or the "others" they might be representing. Now, having learned more about the nature and structure of Lloyd's syndicates than the court ever wanted to know, this conclusion may seem naive in retrospective. Nonetheless, it seemed the best reading of a thin complaint.

It is also the natural corollary of the defendant's argument that the claims for fraud being asserted here are personal to each and every member of the syndicate and cannot be delegated to a representative. Defendant contends that because the tort claim is personal to each "Name," to the extent each was injured by the alleged fraud, each of the approximately 9,400 "Names" must sue on his, her, or its own behalf, and not through a representative. This means there must be 9,400 separate lawsuits of only a few dollars each, or a plaintiff class brought by a class representative. See Rule 23.2, FRCP. That being the case and there being no class allegations in the complaint, it must follow that the claims being asserted here by these twenty underwriters are nothing more than *their personal claims*, not those of other "Names" in their syndicates.

At this point it should be noted that the case of Certain Interested Underwriters of Lloyd's of London v. Layne, 26 F. 3d 39 (6th Cir. 1994), so heavily relied upon by plaintiffs, is not helpful. A key distinction between that case and the present lies in the nature of the claims being asserted. In Layne, the underwriters were asserting a declaratory judgment action, seeking a declaration that they had no obligation to provide coverage under their contract. The issue dealt with the potential liability of the underwriters and, possibly, the

4

"Names" in their syndicates. The <u>Layne</u> court concluded that because the underwriters were potentially liable personally on the contract and because the insured had elected to sue only the lead underwriters, the potential liability of the "Names" had been waived, leaving the underwriters as the only real parties in interest. Thus, the fundamental reasoning of <u>Layne</u> turned on the conclusion that no other person or entity, except the named underwriters and the insured, had any remaining interest in the insurance contract.

In the present case, no such waiver or release of claims by the separate members of the syndicates has occurred. If defendant defrauded everyone who contracted to provide insurance coverage to the Maynes, defendant is correct that each separate "Name" has a personal claim for fraud against defendant, and those several personal claims have not been delegated or released or otherwise extinguished in a way that would leave only the lead underwriters as having any interest in the *tort* claim against defendant. Each "Name" has a separate tort claim for fraud, albeit for tiny damages. Thus, <u>Layne</u> is fundamentally distinguishable from this case.

Therefore, to this point in the analysis, the court's reasoning can be summed up in this manner: the fraud claims asserted are personal to each member of the syndicates and cannot be delegated to a representative. This is not a class action because there are no class allegations in the complaint, and to do so at this point would require extensive notice to all of the "Names" that might constitute the plaintiff class, giving them the opportunity to opt-out of the class. Because the fraud claims are tort claims personal to each injured syndicate

5

member, the claims actually plead here can be nothing more than the personal claims of the lead underwriters, not representative claims on behalf of other "Names." Since the lead underwriters, suing only for their personal claims, are all citizens and residents of the United Kingdom, there is complete diversity of citizenship.

Complete diversity of citizenship is not, however, the end of the jurisdictional analysis. The statute, 28 U.S.C. § 1332, also requires that the claims involve at least $75,000 in controversy, excluding interest and costs. It is here that the court can no longer accept the conclusion that the separate claims of the lead underwriters meet the jurisdictional minimum amount. Instead, the court concludes to a "legal certainty," that none of the claims of the twenty lead underwriters named here as "Certain Underwriters" involves even a small fraction of $75,000.

The law on this question is well established. The plaintiffs' good faith allegation of the jurisdictional amount suffices to establish jurisdiction, unless on the face of the pleadings or from later proof, it becomes clear to a "legal certainty" that plaintiff cannot recover the minimum amount. At that point, the court is duty bound to dismiss the claim for want of subject-matter jurisdiction. Binding precedent in this circuit has stated the rule as follows:

> The test for jurisdictional amount was established by the Supreme Court in St. Paul Mercury Indemnity Co. v. Red Cab Co., [303 U.S. 283, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845, 848 (1938)]. There, the Court held that the determinant is plaintiff's good faith claim and that to justify dismissal it must appear to a legal certainty that the claim is really for less than the jurisdictional amount. There is no question but that this is a test of liberality, and it has been treated as such by this Court. This does not mean, however, that Federal

> Courts must function as small claims courts. The test is an objective one and, once it is clear that as a matter of law the claim is for less than $10,000.00, the Trial Judge is required to dismiss. [Footnotes omitted].

Burns v. Anderson, 502 F.2d 970, 971-972 (5th Cir. 1974); see also Siren, Inc. v. Estes Express Lines, 249 F.3d 1268, 1273 (11th Cir. 2001). Similarly, the court of appeals has stated:

> Although a diversity suit should not be dismissed unless "it is apparent, to a legal certainty, that the plaintiff cannot recover [the requisite amount in controversy]," see St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938), this liberal standard for jurisdictional pleading is not a license for conjecture. In light of the federalism and separation of powers concerns implicated by diversity jurisdiction, federal courts are obligated to strictly construe the statutory grant of diversity jurisdiction, or as the Supreme Court has put it, to "scrupulously confine their own jurisdiction to the precise limits which the statute has defined." Snyder, 394 U.S. at 340, 89 S.Ct. at 1059 (quoting Healy v. Ratta, 292 U.S. 263, 270, 54 S.Ct. 700, 703, 78 L.Ed. 1248 (1934)).

Morrison v. Allstate Indemnity Co., 228 F.3d 1255, 1268 (11th Cir. 2000) (citing Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969)).

In the present case, the court initially applied that "liberal" standard to the pleadings and concluded that it could not say to a "legal certainty," based solely on the pleadings themselves, that plaintiffs could not recover the jurisdictional amount. Thus, the early motions to dismiss on jurisdictional grounds were denied. In light of the discovery and factual development that has occurred since, however, the court is now persuaded to a "legal certainty" that none of the individual plaintiffs (much less each of the named plaintiff

7

underwriters) has a claim that involves at least $75,000. A careful examination of the evidence relating to the amount of damages each named plaintiff might reasonably expect to recover makes clear that their separate individual damages are so limited and modest that none can come close to recovering $75,000.

For the reasons previously explained in the court's order denying defendant's motion for summary judgment, the largest single part of plaintiffs' claim for damages is unavailable to them. Because plaintiffs were fully aware of the alleged misrepresentations at the time the Maynes' fire loss was paid, they cannot establish that they reasonably relied upon the misrepresentations to their detriment. In Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala.1997), the Alabama Supreme Court restated the elements of a fraud action as follows:

> The elements of a misrepresentation claim are 1) a misrepresentation of material fact, 2) made willfully to deceive, recklessly, without knowledge, or mistakenly, 3) which was justifiably relied on by the plaintiff under the circumstances, and 4) which caused damage as a proximate consequence. Ala.Code 1975 § 6-5-101; Harrington v. Johnson-Rast & Hays Co., 577 So.2d 437 (Ala.1991).

Id. at 422; Oakwood Mobile Homes, Inc. v. Barger, 773 So.2d 454, 461 (Ala. 2000) ("A claim of fraud, ..., requires the party making the claim to prove by substantial evidence that he or she *reasonably* relied on the alleged misrepresentation."). The reasonable reliance standard turns on whether the victim of the alleged fraud was or should have been aware of the true facts at the time he or she relied upon the misrepresentations. The Alabama Supreme Court explained:

8

> This Court explained reasonable reliance in Torres v. State Farm Fire & Casualty Co., 438 So.2d 757, [759] (Ala.1983):
>
>> If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover....
>>
>> If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, "*volenti non fit injuria*". Munroe v. Pritchett, 16 Ala. 785, 789 (1849).

Oakwood Mobile Homes, Inc. v. Barger, 773 So.2d 454, 461 (Ala. 2000). Thus, a payment made *after* becoming fully aware of the false nature of representations made to procure insurance coverage cannot be said to be in "reasonable reliance" on the misrepresented facts.

In this case, it is alleged that defendant misrepresented certain facts about the Maynes' home in order to obtain homeowners' coverage for them. At the time the coverage was secured from plaintiffs, it is possible they reasonably relied upon those representations, causing them to enter into the insurance contract with the Maynes. After the fire loss occurred, however, plaintiffs obtained a full investigation of the facts and circumstances of the loss, including discovery of the allegedly misrepresented facts. *After* that discovery, plaintiffs nonetheless paid some $170,000 in insurance proceeds to the Maynes. Without reiterating the reasoning set forth in the order denying summary judgment, the court concludes that this voluntary payment not only waived the plaintiffs' right to invoke the contract clause nullifying the contract for fraud, but also establishes as a matter of law that

9

plaintiffs did not reasonably rely upon the alleged misrepresentations in making the payment. Thus, insofar as plaintiffs attempt to recover damages from defendant for this payment, they cannot do so because the payment was not *caused* by the fraud. Plaintiffs were not induced *by the fraud* to make the payment; indeed, they made the payment *despite* being fully aware of the fraud. Thus, plaintiffs cannot recover for the payment made to the Maynes.

Excluding the fire loss payment as an element of damages plaintiffs may recover, the only losses they suffered otherwise were the costs and expenses associated with administering the fraudulently obtained insurance coverage, including the costs of the fire loss investigation prior to the discovery of the misrepresentations. If plaintiffs had not been induced by the alleged fraud to undertake coverage of the Maynes' home, they would not have incurred these costs and expenses. While not entirely clear, there is evidence before the court to suggest that this loss was about $6,000, less any premiums paid to plaintiffs.

Starting with this figure of $6,000, it is obvious that *each separate* claim of the plaintiffs before the court is, at best, only a tiny fraction of that loss. The entire loss on the policy is divided on a *pro rata* basis among all of the "Names" in the syndicates that shared in the risk of this policy. Lead underwriter Michael Kariaciou's syndicate assumed the largest portion of the risk at 21%; thus, his *syndicate's* total share of the loss would be about $1,260. But Mr. Kariaciou's *personal* share of that loss would be a much smaller fraction of the total loss taken by the syndicate as a whole. Although the record does not reveal the percentage of risk *personally* shouldered by Mr. Kariaciou, it certainly is less that the risk

assumed by his syndicate as a whole, or less than $1,260. In short, it appears certain that the largest *personal* claim for loss that can be asserted by any of the twenty plaintiffs personally before the court is less than a thousand dollars (probably far less). The losses of the other plaintiffs are far less than that. Even accounting for the possibility of an award for mental and emotional damages[2] and for punitive damages[3], it is clear to a legal certainty that none of the twenty plaintiffs before the court have a *personal* claim for damages that even approaches the jurisdictional minimum of $75,000. Certainly, it is now beyond doubt that their separate personal claims cannot be aggregated, either as to compensatory or punitive damages, in order to meet the minimum. Zahn v. International Paper Co., 414 U.S. 291, 94 S.Ct. 505, 38 L. Ed. 2d 511 (1974); Smith v. GTE Corp., 236 F.3d 1292 (11th Cir. 2001); Lindsey v. Alabama Telephone Co., 576 F.2d 593 (11th Cir. 1978); Cohen v. Office Depot, Inc., 204 F.3d 1069 (11th Cir. 2000). Consequently, none of the personal claims of these plaintiffs before the court can meet the $75,000 floor necessary for the court to exercise jurisdiction.

---

[2] The likelihood that any of these plaintiffs, experienced insurance underwriters, suffered any significant mental or emotional damages due to this transaction is small, as would be any compensatory damages for them.

[3] In light of BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), it is a legal certainty that each plaintiff could not recover enough in punitive damages to top the jurisdictional minimum. On remand from the United States Supreme Court, the Alabama Supreme Court concluded in Gore that a total award of $50,000 was proper where the plaintiff had suffered $4,000 in compensatory damages. BMW of North America, Inc. v. Gore, 701 So.2d 507 (Ala. 1997). Here, where at most the compensatory award would be about the same, it is clear the punitive damages would not carry the case over the jurisdictional minimum, even for the plaintiff with the largest possible personal claim, much less those plaintiffs with smaller claims.

## Conclusion

In summary, the court finds that for diversity jurisdictional purposes, the only plaintiffs before the court are those twenty lead underwriters previously identified in discovery (although not explicitly named in the complaint), suing only in their personal capacities and not as representatives of any other "Name" or member of their respective syndicates. Any other reading of the complaint necessarily injects into the jurisdictional calculus the citizenship of all 9,400 "Names" who are members of the lead underwriters' syndicates. Reading the complaint to be brought only by the twenty lead underwriters in their personal capacities, there is complete diversity of citizenship between them and the defendant. Unfortunately for them, however, reading the complaint in this manner simply underscores the impossibility of any of the plaintiffs having a claim that meets the jurisdictional minimum amount in controversy. Therefore, because the jurisdictional floor cannot be met by any (much less all) of the plaintiffs, the action must be dismissed without prejudice for lack of diversity jurisdiction. A separate order will be entered.

DONE this _22_ day of April, 2002.

T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE